BROWNE GEORGE ROSS LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone:  (310) 274-7100
Facsimile:  (310) 275-5697

K.C. Maxwell (State Bar No. 214701)
  kmaxwell@bgrfirm.com
101 California Street, Suite 1225
San Francisco, California 94111
Telephone:  (415) 391-7100
Facsimile:  (415) 391-7198

Attorneys for Plaintiff Atari Interactive, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ATARI INTERACTIVE, INC.,<br><br>                    Plaintiff,<br><br>          vs.<br><br>NESTLÉ, SA; NESTLÉ UK LTD; and NESTLÉ USA, INC.,<br><br>                    Defendants. | Case No.<br><br>COMPLAINT FOR:<br><br>(1)   TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114;<br>(2)   COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. §§ 101 et seq.;<br>(3)   FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(a);<br>(4)   DILUTION UNDER 15 U.S.C. § 1125(c);<br>(5)   UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200; AND<br>(6)   COMMON LAW UNFAIR COMPETITION<br><br>DEMAND FOR JURY TRIAL |

836555.1

## PRELIMINARY STATEMENT

1.      Atari brings this action to remedy Nestlé's blatant invasion and misappropriation of its intellectual property rights related to the iconic *Breakout* video game.

2.      In 1975, two little known but up-and-coming developers – Steve Jobs and Steve Wosniak – created *Breakout* for Atari, which was then looking to follow-up on its groundbreaking hit game, *Pong*.[1]  The new simple, addictive game was also a hit, and helped propel Atari to its long-held spot on top of the video game industry.

3.      Forty years later Nestlé decided that it would, without Atari's authorization, leverage *Breakout* and the special place it holds among nostalgic Baby Boomers, Generation X, and even today's Millennial and post-Millennial "gamers" in order to maximize the reach of worldwide, multi-platform advertisements for Nestlé KIT KAT bars.

4.      To be clear, this is not a case where a good faith dispute could exist between the rights holder and alleged infringer.  Instead, Nestlé simply took the classic *Breakout* screen, replaced its bricks with KIT KAT bars, and invited customers to ***"Breakout"*** and buy more candy bars.

5.      Adding insult to injury, Nestlé's "Breakout" campaign was comprehensive, and the infringement continues to this very moment.  KIT KAT ads centered on the exploitation and misuse of the Breakout name, and the Breakout look, feel, sound, and imagery remain on Twitter, under Nestlé's Twitter handle, and on Facebook, on Nestlé's Facebook page, for all the world to see.  Nestlé's

---

[1]      The late Mr. Jobs subsequently explained that the $5,000 he was paid for *Breakout* served as seed money for his nascent company, Apple.  Mr. Wozniak has said that the process of engineering *Breakout* led to several innovations later employed in the landmark Apple II personal computer.

        Unless otherwise indicated, all emphasis is added and internal citations omitted. Citations to website addresses in this Complaint were last viewed on August 14, 2017.

video advertisement for KIT KAT – brazenly **entitled** "Breakout" – is available to every world citizen with an internet connection on Vimeo at https://vimeo.com/204352144.  Accordingly, any potential Atari licensee will have to consider both Atari's past and continuing involuntary association with Nestlé when determining whether to license *Breakout*, or hundreds of other Atari games (*e.g. Asteroids*, etc.).  Given the multi-billion dollar advertising markets for food alone, or even candy, confectionaries, or chocolate more narrowly, Atari's licensing opportunities have been eliminated, or dramatically degraded, across a wide range of products and sectors.

6.     As had to have been obvious to a global behemoth whose business depends on the sophisticated, comprehensive marketing of a wide swath of consumer goods, Nestlé's heist of Atari's intellectual property rights in *Breakout* violates several provisions of law.  The use of the term "Breakout" – one word – in this context is the plainest invasion and infringement of Atari's trademark rights. The use of the look, feel, sound, and operation of *Breakout* game screens is the plainest invasion and infringement of Atari's trade dress and copyrights. Accordingly, Nestlé's continuing, unauthorized use of Atari's intellectual property should be enjoined, and the damage it has caused and continues to cause should be remedied by the Court.

## NATURE OF THIS ACTION

7.     This is an action in law and equity for trademark infringement, dilution, false designation of origin, copyright infringement, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*; the United States Copyright Act, 17 U.S.C. § 101 *et seq.*; the California Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200; and the common law.

## THE PARTIES

8.     Plaintiff Atari Interactive, Inc. ("Atari" or "Plaintiff") is a Delaware Corporation with a business address of 475 Park Avenue South, New York, New

York 10016.  Atari is a pioneer in the video game industry, with titles including the seminal and instantly recognizable *Pong*, *Breakout*, *Asteroids*, and others.  Atari remains a multi-platform, global interactive entertainment company, having adapted many of its classic games for online platforms like Facebook, as well as for smartphones and tablets.  It also develops and distributes interactive entertainment for video game consoles from Microsoft and Sony.  As a licensor, Atari extends its brand and franchises into other media, merchandising, and publishing categories. Atari is the owner, by assignment, of all right, title, and interest in Atari intellectual property ("Atari IP"), including the trademarks and copyrights relating to *Breakout*. Atari trades publicly on the Euronext Paris stock exchange.

9.      Defendant Nestlé SA is a Swiss corporation having an address and principal place of business of Avenue Nestlé 55, Vevey, Switzerland.

10.      Defendant Nestlé UK Ltd is a subsidiary of Nestlé and is a company organized under the laws of the United Kingdom having a business address of 1 City Place, Gatwick, England.

11.      Defendant Nestlé USA, Inc. is a subsidiary of Nestlé SA and is a California corporation with a business address of 800 North Brand Boulevard, Glendale, California.  This Complaint refers to the three Nestlé entities, collectively and individually, as "Nestlé" or "Defendants."

12.      Nestlé, its products, and its advertisements are ubiquitous; it is among the largest and best known food companies in the world.  It is an international conglomerate that sells everything from baby food (Gerber) to snacks (Chips Ahoy!, Toll House cookies, PowerBar) to petcare products (Fancy Feast, Purina) to mineral water (Arrowhead, Ozarka).  It owns dozens of top-name brands, many with annual sales of over one billion U.S dollars.  Nestlé is particularly well-known for its chocolate and confectionary offerings, which include Nestlé Crunch, Baby Ruth, 100 Grand Bar, Butterfinger, Raisinets, Smarties, and Wonka brand products. Nestlé's jingles, too, are famous, from "Nestlé makes the very best" (Nestlé Quik),

1   to "Nobody better lay a finger on my Butterfinger" (Butterfinger).  Nestlé's logos

2   and associated "characters" – like the Gerber baby and Keebler Elves – are similarly

3   recognized and memorable.  Nestlé is, accordingly, a savvy, ultra-experienced

4   marketer with a long history of licensing intellectual property and protecting its

5   own.  At all relevant times Nestlé has been responsible for marketing KIT KAT and

6   is responsible for the infringing advertisements at issue.

7                          **JURISDICTION AND VENUE**

8          13.    This Court has subject matter jurisdiction over this action pursuant to

9   15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338 because the action arises under

10  the Federal Copyright and Lanham Acts, 17 U.S.C. § 101, *et seq*., and 15. U.S.C. §

11  1051, *et seq*.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §

12  1367 and 28 U.S.C. § 1338(b).

13         14.    Venue in this county is proper under 28 U.S.C. § 1391 because

14  Defendants are subject to personal jurisdiction in this district and Atari has suffered

15  injury in this district.

16         15.    This Court has personal jurisdiction over Defendants because (a)

17  Defendants have committed tortious acts in this district, and Plaintiff's claims arise

18  out of such acts; (b) Defendants regularly conduct business in this district; and (c)

19  Defendants have otherwise made or established contacts in this district sufficient to

20  permit the exercise of personal jurisdiction.

21     **NESTLÉ'S UNAUTHORIZED, BLATANT MISAPPROPRIATION AND**

22      **MISUSE OF ATARI'S TRADEMARK AND COPYRIGHTED PROPERTY**

23              **A.    Atari's Iconic Game, *Breakout***

24         16.    *Breakout* was conceptualized by Atari founder Nolan Bushnell, along

25  with Steve Bristow, after the home version of Atari's *Pong* became a breakaway

26  sensation in 1975.  Atari sought to capitalize on *Pong's* popularity and expand its

27  user base by developing a similarly popular game that could be played by one

28  person.  One challenge Atari faced was the price of logic chips, with typical games

1  needing 100-175 chips apiece, multiplied by tens of thousands of units.  Bushnell

2  challenged his engineers to reduce the number of chips, offering a bonus for each

3  chip removed in a prototype, in hopes to get below 75.

4        17.     One young engineer, Steve Jobs, claimed he could hit that mark in four

5  days.  In reality, Mr. Jobs enlisted his friend, Steve Wosniak, then an engineer at

6  Hewlett Packard, to do the legwork in exchange for half of the bonus.  Mr. Wozniak

7  spent around 72 hours minimizing *Breakout's* circuitry, delivering an initial

8  prototype with just 20-30 circuits, and a final prototype with just 44 chips.[2]  Mr.

9  Jobs was paid $5,000 for the work.

10        18.     *Breakout* cemented Atari's place atop the gaming industry, becoming a

11  huge hit.  Its success has spawned multiple reinventions of the game – *e.g.* Super

12  *Breakout* and *Breakout 2000* – which, together with the original *Breakout*, remain

13  available across countless platforms including Video Pinball, PC, Apple,

14  PlayStation, Xbox 360, mobile, and multiple Atari consoles.  Atari's iPhone version

15  of *Breakout* has been downloaded more than ***2 million times*** since its 2008 release

16  via the iTunes store.[3]

17        19.     *Breakout* is a widely acknowledged classic of its genre, "arguably

18  second only to Pong" in its influence on gaming.[4]  The game's appeal and resonance

19  continue to this day.  In recent years, in honor of the 37th anniversary of the game's

20  release, and with the prior written authorization of Atari, Google released a secret

---

22  [2]     Mr. Wozniak's design was said to be so compact and ingenious that it could
not be replicated on a mass production level, so the final *Breakout* board shipped

23  with 100 chips.  *See* Damien McFerran, *Atari's Breakout is 40 today - all gamers
need to know how it came to be,* (Apr. 13, 2016),
http://www.digitalspy.com/gaming/feature/a790432/atari-breakout-40-today-all-

24  gamers-need-to-know-how-it-came-to-be.  Later, after Mr. Jobs and Mr. Wozniak
formed Apple with funds earned developing *Breakout*, Mr. Wozniak incorporated

25  his *Breakout* innovations into the engineering of Apple's first great personal
computer, the Apple II.  *Id.*

26  [3]     Atari, Interactive, *Breakout: Boost,* Apple iTunes (Jan. 14, 2016),

27  https://itunes.apple.com/us/app/breakout-boost/id476059948?mt=8.

28  [4]     *See* McFerran, *supra* note 2.

1   "Easter Egg" version of the game via its Google Image search feature.[5]

2                           **B.      Atari's Intellectual Property Program**

3           20.     As an icon of early Silicon Valley ingenuity; a touchstone, especially,

4   of the 1970's and 1980's; a brand with worldwide recognition in its own name, and

5   in its games; and an entity that continues as a global entertainment developer and

6   licensor, Atari maintains a robust, valuable, and highly desirable portfolio of

7   intellectual property.

8           21.     The Atari group is comprised of Atari Interactive, Atari, Inc., and other

9   Atari-related entities.  Atari owns the Atari IP that includes the trademarks and

10  copyrights relating to *Breakout*.

11          22.     *Breakout* is one of the key elements of the licensing program.  In

12  addition to being created by towering legends of the tech world, its name, visuals,

13  and game play are recognizable, familiar, and famous worldwide.  *Breakout*

14  achieved instant, widespread popularity as the best-selling video game in 1978.[6]

15  That fame and goodwill has persisted for decades.  *Breakout* routinely ranks on

16  published lists of the best video games of all time.[7]

17          23.     *Breakout's* name recognition, familiarity, fame, and value in Atari's

18  robust IP licensing portfolio has attracted potential licensors.  Atari has generated

19  substantial revenue in licensing *Breakout* and has very valuable ongoing licensing

20  agreements with major corporations.

21  _____

22  [5]      *See Breakout (video game),* Wikipedia (May 30, 2017, 4:27 PM),
    https://en.wikipedia.org/wiki/Breakout_(video_game); Danny Goodwin, *Google
23  Images Easter Egg: Search 'Atari Breakout' to Play Image Breakout Game* (May
    14, 2013), https://searchenginewatch.com/sew/news/2267999/google-images-easter-
24  egg-search-atari-breakout-to-play-image-breakout-game.

    [6]      Hanuman Welch, *The Best Selling Video Game Of Every Year Since 1977*
25  Complex (Apr. 23, 2013), http://uk.complex.com/pop-culture/2013/04/the-best-
    video-games-to-come-out-every-year-since-the-atari-2600/breakout.
26
    [7]      *See, e.g.,* Chris Bonanno, *The Complete List of the 50 Greatest Video Games
27  Ever,"* Florida Today (last updated Sept. 23, 2016, 12:19 AM),
    http://www.floridatoday.com/story/tech/gaming/2016/09/21/complete-list-50-
28  greatest-video-games-ever/90809786/.

## C.     Atari's IP Rights In *Breakout*

24.     The BREAKOUT mark has been in use continuously since 1975, first on arcade games and then later on home game consoles and computers.  Atari owns a collection of BREAKOUT trademarks registered with the United States Patent and Trademark Office ("USPTO"):

| Mark | Registration No. | Registration Date | Status | Goods/Services |
|---|---|---|---|---|
| BREAKOUT | 2553961 | March 26, 2002 | Incontestable | Computer game programs and video game cartridges |
| SUPER BREAKOUT | 1241326 | June 7, 1983 | Incontestable | Non-coin-operated electronic amusement game equipment |
| BREAKOUT BOOST | 4168075 | July 3, 2012 | Registered | Downloadable electronic games via the Internet |

25.     All of the aforementioned registrations are valid and subsisting, and the registrations for BREAKOUT and SUPER BREAKOUT have become incontestable pursuant to 15 U.S.C. § 1065.  Copies of the certificates of registration are attached as Exhibit A.

26.     Atari also owns all right, title, and interest in several copyrights related to the *Breakout* game, each of which is registered with the United States Copyright Office:

| Registration No. | Registration Date | Publication Date | Description |
|---|---|---|---|
| PA0000175216 | June 9, 1983 | Nov. 9, 1978 | *Breakout,* Computer File: 12 videogames, 1 instruction booklet, 1 sticker; New Matter: new sounds in |

-7-
COMPLAINT

| | | | |
|---|---|---|---|
| | | | audiovisual work & new artwork & text on package & instructions. |
| PA0000610716 | Feb. 6, 1987 | May 15, 1976 | *Breakout,* Computer File: Videogame. |
| TX0000058926 | June 29, 1978 | June 26, 1978 | *Breakout,* Text: Game Program Instructions. |
| VA0000015994 | Oct. 27, 1978 | Jan. 2, 1978 | *Breakout,* Visual Material: Video computer system game program, printed carton. |
| VAu000008876 | April 4, 1979 | *not listed* | ***Super Breakout,*** Visual Material: Fabrication, schematic diagram, depiction of circuits and wiring. |
| TX0000452507 | April 14, 1980 | March 10, 1980 | ***The Original Super Breakout,*** Visual Material. |
| PA0000175215 | June 9, 1983 | Jan. 8, 1982 | ***Super Breakout,*** Computer File: 9 videogames, 1 instruction booklet, 1 sticker; New Matter: new sounds in audiovisual work & new artwork & text on package & instructions. |
| PA0000662697 | Oct. 7, 1988 | June 15, 1978 | ***Super Breakout,*** Computer File: Videogame; New Matter: sounds and images in audiovisual work. |
| TX0000180834 | Jan. 22, 1979 | Sept. 9, 1978 | ***Super Breakout,*** Text: operation, maintenance and service manual, complete with illustrated parts catalog. |

## D.    Nestlé's Unauthorized "Breakout" Campaign

27.    In 2016, Nestlé unveiled a new ad campaign for its ubiquitous KIT KAT chocolate bars.  The ads varied in style and platform, but all contained a

common thread:  each blatantly pilfered Atari's mark and/or the look, feel, sound, and imagery of *Breakout*.

28.    In at least one video advertisement, Nestlé's ad begins with four actors – two young, two middle-aged, in keeping with *Breakout's* multi-generational appeal – sitting on a couch playing a video game.  The game is revealed to be *Breakout*, with the nominal and insignificant difference between the classic version and Nestlé's unauthorized version being that the long, rectangular bricks players "break" in the former are replaced with long, rectangular bricks made of KIT KAT chocolate bars in the latter.

29.    Nestlé's video advertisement is entitled "Breakout."[8]

30.    On information and belief, the video advertisement originally appeared in the UK on internet and television, and was later uploaded to the YouTube website (presumably by Defendants), obtaining a worldwide audience (inclusive of the United States), in order to maximize the impact of Nestlé's "Breakout" campaign. YouTube alone has approximately 1 billion active users each month.[9]  A screen shot of that advertisement is attached as Exhibit B.

31.    The video advertisement continues to be readily available to any viewer with an internet connection.[10]

32.    Nestlé's "Breakout" video advertisements depict imagery of the *Breakout* game which is covered and protected by Atari's valid registered copyrights.

33.    The game simulation depicted in Nestlé's video advertisement is substantially similar to the *Breakout* graphics covered by Atari's valid registered

---

[8]    *PRODUCER: Dale Healy – 'Kit Kat: Breakout' (Commercial – TVC),* 2AM Films (Feb. 16, 2017, 8:06 AM), https://vimeo.com/204352144.

[9]    Reuters, *YouTube Stats: Site Has 1 Billion Active Users Each Month*, Huffington Post (March 21, 2013), http://www.huffingtonpost.com/2013/03/21/youtube-stats_n_2922543.html.

[10]    *See* Dale Healy, *supra* note 9.

1   copyrights.

2        34.    Nestlé placed a second infringing advertisement on Facebook, one of

3   the world's largest and most significant advertising platforms.[11]  That advertisement

4   also copies *Breakout's* imagery and gameplay, with the nominal and insignificant

5   difference, again, of *Breakout* bricks being replaced by Nestlé's KIT KAT bars.

6   Beneath the image, KIT KAT's Facebook page invites users to "Get your game on

7   Breakout Breakers!"  A screenshot of the ad is attached as Exhibit C.

8        35.    The Facebook advertisement remains available to all Facebook users.[12]

9        36.    Nestlé's "Breakout" advertisements placed on Facebook violate Atari's

10  duly-registered, incontestable trademark in the term "Breakout."

11       37.    Nestlé's "Breakout Breakers" Facebook ad depicts imagery of the

12  *Breakout* game which is covered and protected by Atari's valid registered

13  copyrights.

14       38.    The game simulation depicted in the "Breakout Breaker" Facebook

15  advertisement is substantially similar to the *Breakout* graphics covered by Atari's

16  valid registered copyrights.

17       39.    Nestlé placed additional infringing advertisements on the Twitter

18  platform.  Twitter has approximately 328 million active monthly users.[13]  Nestlé's

19  Twitter handle has, as of the date of this filing, approximately 190,000 followers.

20  The KIT KAT U.S. Twitter handle has 362,000 followers.  Nestlé's Twitter ad

21

22  [11]    *See, e.g.,* Kathleen Chaykowski, *Sheryl Sandberg: Facebook's 4 Million Advertisers Are 'Proof' Of The Power Of Mobile,* Forbes (Sept. 27, 2016, 1:34 PM),

23  https://www.forbes.com/sites/kathleenchaykowski/2016/09/27/sheryl-sandberg-facebooks-4-million-advertisers-are-proof-of-the-power-of-mobile/#a2f3d5c1f17b;

24  Mathew Ingram, *How Google and Facebook Have Taken Over the Digital Ad Industry,* Fortune (Jan. 4, 2017), http://fortune.com/2017/01/04/google-facebook-ad-industry/.

25  [12]    KitKat, Facebook (Mar. 4, 2016),

26  https://www.facebook.com/KitKatSA/videos/1073282116069651/.

27  [13]    Daniel Sparks, *How Many Users Does Twitter Have?,* The Motley Fool, (Apr. 27, 2017, 11:06 PM), https://www.fool.com/investing/2017/04/27/how-many-users-does-twitter-have.aspx.

28

explicitly uses the BREAKOUT mark in conjunction with the infringing video posted there. The video posted to Twitter, like the other offending videos, features Atari's *Breakout*, with KIT KAT chocolate bars replacing *Breakout's* bricks. The tagline of one of Nestlé's Twitter advertisements asks: "Is it time to break out of the Breakout?!" Another repeats the tagline used on Facebook: "Get your game on Breakout Breakers!" In an attempt to capture a wider audience, Nestlé also posted a similar Twitter ad in Spanish, using the tagline "Es hora de romper el Breakout (?)". Screenshots of the Twitter advertisements are attached as Exhibit D.

40. At least some of the infringing advertisements remain available to all Twitter users.

41. The use of the term "Breakout" – capitalized and all one word – amplifies the connection to *Breakout*, deepening KIT KAT's (false) association with Atari and reinforcing the connection created by the infringing video portion of the advertisement.

42. Nestlé's "Breakout" advertisements placed on Twitter violate Atari's duly-registered, incontestable trademark in the term "Breakout," *i.e.* the BREAKOUT mark.

43. Nestlé's "Breakout" advertisements placed on Twitter depict imagery of the *Breakout* game which is covered and protected by Atari's valid registered copyrights.

44. Nestlé's game simulation depicted in its video advertisement is substantially similar to the *Breakout* graphics covered by Atari's valid registered copyrights.

**E.      Atari Has Been Damaged, And Continues To Be Damaged, By Nestlé's Unauthorized "Breakout" Advertising Campaign**

45. Atari's IP licensing activities are responsible for a significant portion of its annual revenues. Revenues from its best-known games make up a significant portion of those revenues.

46.   Without the benefit of its licensing revenues, profits of Atari would be significantly lower.

47.   As an initial, straightforward matter, Nestlé has denied Atari the licensing fees it would have charged Nestlé for use of Atari's intellectual property in the widely distributed KIT KAT "Breakout" campaign, had Atari agreed to such use.

48.   In addition, on information and belief, a significant factor in a licensee's decision to license is whether the subject property has been licensed to marketers in the advertiser's market.  For example, if a licensor licenses trademarked or copyrighted property to Coca-Cola, it is extraordinarily unlikely that it can license the same property to Pepsi, whether because of contract, custom, or common sense.

49.   On information and belief, this factor – the inability to license property to licensees in the same market – extends to adjacent markets.  For example, if a licensor licenses trademarked or copyrighted property to Coca-Cola, it is extraordinarily unlikely that it can license the same property to a manufacturer of bottled water, whether because of contract, custom, or common sense.

50.   Whether considered as the market for candy, chocolate, confectionaries, foodstuffs, or some similar market or sub-market, KIT KAT bars are sold in an enormous market featuring billions of dollars of annual advertising dollars.

51.   In one fell swoop, Nestlé has unilaterally eliminated Atari from these markets.  For example, the Hershey Company spends over $500 million annually advertising its products.[14]  Mars Inc. spends over $700 million annually advertising

---

[14]   *See Advertising Expenditure of the Hershey Company Worldwide from 2008 to 2016 (in million U.S. dollars),* Statista (2017) https://www.statista.com/statistics/294536/hershey-company-advertising-expenditure.

its products.[15]  The broader markets for candy, chocolate, confectionaries, and foodstuffs are, obviously, many times those amounts.  Atari almost assuredly cannot license to Hershey, Mars, or Nestlé's myriad other competitors, and it has likely been eliminated as a potential licensor by scores of additional companies.

52.     On information and belief, the dynamic described in this section applies beyond the potential licensees of *Breakout*.  That is, Atari can almost assuredly not license *Asteroids*, *Centipede*, or more than 200 other games to Hershey, Mars, or Nestlé's other competitors, and it has likely been eliminated as potential licensor by scores of additional companies for all of its offerings.

53.     To the extent Atari's IP offerings have not been eliminated by Nestlé in markets related to or adjacent to KIT KAT bars, Atari's bargaining position has been significantly reduced, which will likely result in diminished revenues from licensees willing to license Atari IP notwithstanding its involuntary association with KIT KAT and Nestlé.

54.     Accordingly, Nestlé's "Breakout" campaign has diluted the value of Atari's trademarks and degraded the value of its copyrights, on a going-forward basis.

55.     On information and belief, Nestlé's "Breakout" campaign has also engendered consumer confusion.  One natural takeaway of Nestlé's "Breakout" campaign is that Atari endorses KIT KAT bars.  Many consumers, presumably, do not care for KIT KAT bars, and Nestlé has unilaterally associated Atari with products that many in Atari's target demographics may find unlikable, overly "corporate," unhealthy, boring, tired, or otherwise.

56.     More broadly, simple Google searches indicate that Nestlé has been

---

[15]     *See Mars Inc.'s Advertising Spending in the United States from 2009 to 2015 (in million U.S. dollars),* Statista (2017), https://www.statista.com/statistics/463074/mars-ad-spend-usa/.

1  associated with numerous scandals over the years.[16]  Those scandals include

2  allegations that Nestlé falsely advertised to impoverished nations that its baby

3  formula was as good, or nearly as good, as breast milk, leading to reams of bad

4  press and a consumer boycott.[17]  Nestlé's chocolate business, it has been alleged, has

5  been associated with slave and child labor.[18]  Nestlé has also been associated with

6  pollution and environmental degradation; the demanding of repayment of debt from

7  Ethiopia while it was experiencing famine; the striking of a multi-million deal with

8  Zimbabwe's tyrannical dictator, Robert Mugabe, and a massive price fixing

9  scandal.[19]

10      57.    Nestlé has also been associated with consumer endangerment and

11  illness.  The U.S. Food and Drug Administration, in 2009, warned consumers to

12  avoid eating any varieties of prepackaged Nestlé Toll House refrigerated cookie

13  dough due to risk of contamination with E. coli, leading to a massive recall.[20]

14  number of Nestlé's other offerings have been recalled for similar reasons.[21]  Most

15  relevant for present purposes, earlier this year, Nestlé recalled a batch of **_KIT KAT_**

16  **_Original Milk Chocolate Bites Pouch Bags_**.[22]

17

---

18  [16]    *See, e.g.,* Mihai Andrei, *Why Nestle Is One Of The Most Hated Companies In The World,* ZME Science (May 19, 2017, 8:53 PM),

19  http://www.zmescience.com/science/nestle-company-pollution-children.

20  [17]    *Id.*

21  [18]    *Id.*

22  [19]    *Id.*

23  [20]    *Updated on Recalled Nestlé Toll House Cookie Dough,* U.S. Food And Drug Administration (July 15, 2009),

24  https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm168012.htm.

25  [21]    *Nestlé USA Announces Voluntary Recall of a Limited Number of DiGiorno Pizzas, Lean Cuisine and Stouffer's Products Due to the Potential Presence of Foreign Material,* Nestlé USA (Mar 10, 2016),

26  http://www.nestleusa.com/media/pressreleases/nestle-digiorno-stouffers-lean-cuisine-voluntary-recall (Nestlé press release noting recall of DiGornio, Lean Cuisine, and Stouffers products).

27  [22]    *KitKat Bites recall and peanut/nut allergy warning,* Nestlé USA (Apr 14,

28  2017), http://www.nestle.co.uk/media/pressreleases/kitkat-bites-recall-and-nut-

58.     That Nestlé may take issue with any of the scandalous, improper, or unfortunate conduct or events with which it has been associated does not matter at all.  The point is that Nestlé has been associated with such conduct or events, and that information – true, false, overstated, or otherwise – is readily available to all of Atari's potential licensees or customers.  Atari had a right to decide for itself whether or not to associate itself with Nestlé, warts and all, and to determine whether the licensing fee justified such an association.  Nestlé stole that decision-making process from Atari and paid Atari **nothing** in exchange.

59.     Accordingly, Atari has been damaged by the false designation of origin implicit in Nestlé's "Breakout" campaign, and it continues to be damaged by that false association.

### F.     Nestlé Has No Excuse[23]

60.     As set forth above, the infringing conduct in this case is so plain and blatant that Nestlé cannot claim to be an "innocent" infringer.  Nestlé is a corporate giant, an experienced marketer, an owner of a massive portfolio of IP itself, a frequent litigant, and a deep pocket with access to scores of in-house and outside counsel.  Nestlé knew exactly what it was doing.

61.     Nestlé's conduct was willful, obviously designed to leverage the decades of goodwill Atari and *Breakout* have garnered across multiple generations.  Its ads were specifically designed to piggyback on the scope of the public's familiarity with Atari and *Breakout*, given that millions of consumers, from the youngest gamers to aging Baby Boomers, have been exposed to the game.  The infringement was not hidden, fleeting, or innocuous – *Breakout* is the central player, and binding thread, across all of the infringing ads.

---

allergy-warning.

[23]     Atari does not bear the burden of disproving Nestlé's potential defenses.  It includes the discussion here because it supports Atari's prayer for treble damages, and in hopes that Nestlé will not waste the Court's, Atari's, and its own time and resources in raising them.

62.     The infringing conduct is not, by any stretch, "fair use" of Atari's IP. Nestlé's appropriation of Atari's IP was commercial.  It did not use Atari's IP for purposes of criticism, commentary, or education.  Nestlé made creative (if only somewhat creative) use, not factual or utilitarian use, of Atari's IP.  Nestlé made significant, not fleeting, use of Atari's IP.  Indeed, as is obvious from the name of the campaign – "Breakout" – Atari's IP was at the heart of Nestlé's ads.  Nestlé did not meaningfully "transform" Atari's IP – Atari's IP was used to depict or invoke Breakout, notwithstanding the slight tweak it made to the game, and the look, sound, imagery, and terminology deployed in the ads could only have been deployed to invoke the original.  Finally, Nestlé has not created a "parody" of *Breakout*, as it offers no critique or commentary on the *Breakout* game itself.

63.     Atari is not estopped from making these claims.  Atari discovered Nestlé's acts of infringement in or around October of 2016, and promptly demanded that Nestlé cease its infringement by letter dated October 28, 2016.  Nestlé's UK counsel responded by letter of November 25, 2016, disclaiming any wrongful acts by Nestlé and asserting that UK law applied to this dispute.[24]  Atari retained U.S. counsel to respond to Nestlé's UK counsel.  By letter dated December 15, 2016, Atari's US counsel responded to Nestlé's UK counsel and explained why U.S. law applied.  From October 2016 through at least February 2017, Defendants continued their infringing acts but ultimately claimed to have removed the infringing advertisements from Twitter, YouTube, and elsewhere. As shown above, that representation was untrue, as Nestlé's ads remain posted under Nestlé's name in a variety of fora.

64.     Finally, Atari has not "abandoned" its rights in *Breakout*.  To the

---

[24]     This argument is frivolous given, among other things, the ads' reach into the United States, the protection afforded to Atari's IP by federal law, and the absence of any contract between Nestlé and Atari containing a choice of law provision naming UK law as governing.

contrary, it continues to maintain its trademark and copyrights, and it actively licensed them before Nestlé's infringement. *Breakout* is also available for download from the iTunes store.

## FIRST CAUSE OF ACTION

### (Federal Trademark Infringement Under 15 U.S.C. § 1114)

### (Against All Defendants)

65.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 64 of this Complaint as if fully set forth here.

66.     The BREAKOUT trademark is distinctive, strong, valid, and incontestable, and is owned by Atari.

67.     Nestlé's use of the BREAKOUT trademark was in connection with an advertisement which also infringes the copyright in Atari's copyrighted BREAKOUT game.  Atari has demanded that Defendants refrain from the use of the BREAKOUT trademark, but Defendants have continued to use, without Atari's authorization, the BREAKOUT trademark.

68.     Nestlé's unauthorized use of the BREAKOUT mark has diluted, and degraded, Atari's trademark in BREAKOUT and the value thereof.

69.     Nestlé's use of the BREAKOUT trademark has created, and continues to create, consumer confusion, mistake, or deception as to the source or sponsorship of Nestlé's products and/or is likely to lead the consuming public to believe that Atari has authorized, approved, or somehow sponsored Nestlé's marketing campaign.

70.     Nestlé's conduct, as alleged above, constitutes trademark infringement in violation of the Federal Lanham Act, 15 U.S.C. § 1114(1).

71.     Atari has been, and will continue to be, damaged and irreparably harmed by Nestlé's actions, which will continue unless Defendants are enjoined by this Court. Although Nestlé claims to have removed the infringing advertisement from Twitter, Nestlé has denied liability and therefore is free to re-post the

advertisement absent an injunction. The ads remain on Facebook, and they are available elsewhere on the internet.  Atari has no adequate remedy at law in that the amount of damage to Plaintiff's business and reputation and the diminution of the goodwill of BREAKOUT trademark is difficult to ascertain with specificity.  Atari is therefore entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

72.     Atari is entitled to recover damages and/or Nestlé's profits in an amount to be determined at trial.

73.     Nestlé's actions were undertaken willfully and with the intention of causing confusion, mistake, and deception, making this an exceptional case entitling Plaintiff to recover treble damages, reasonably attorneys' fees, and costs pursuant to 15 U.S.C. § 1117, as well as prejudgment interest.

## SECOND CAUSE OF ACTION

**(Copyright Infringement Under The Copyright Act, 17 U.S.C. §§ 01 *et seq.*)**
**(Against All Defendants)**

74.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 73 of this Complaint as if fully set forth here.

75.     Atari owns copyright interests in the BREAKOUT video game, which is an original copyrighted work under the laws of the United States.

76.     Atari has the exclusive right to prepare derivative works based upon the copyrighted work, the BREAKOUT game, pursuant to 17 U.S.C. § 106 (2).

77.     Nestlé's unauthorized use, modification, reproduction, display, and distribution of elements of the BREAKOUT game in its advertisements constitutes a violation of the United States Copyright Act, 17 U.S.C. §§ 106(1), (2), and (3), and Defendants were acting as infringers within the meaning of 17 U.S.C. § 501(a).

78.     Defendants willfully, intentionally, and purposefully infringed Atari's copyrights in the BREAKOUT game through the conduct described above.

79.     As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to actual or statutory damages in an amount to be proven at trial.

80.     Plaintiff is also entitled to Nestlé's profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

81.     Plaintiff is further entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

82.     As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

### (False Designation of Origin Under 15 U.S.C. § 1125(a))

### (Against all Defendants)

83.     Plaintiff re-alleges and incorporates herein by reference paragraph 1 through 82 of this Complaint as if fully set forth here.

84.     Nestlé uses the term "Breakout" in its commercial advertisements and tweaks the imagery of the *Breakout* gameplay in an insignificant and insubstantial way.  Atari has licensed to Nestlé neither the right to include the BREAKOUT mark, nor the right to include the copyrighted *Breakout* gameplay, in Nestlé's ad campaign.  Nestlé never sought Atari's permission to use its IP and Atari never granted such permission.

85.     Nestlé's use of the term "Breakout" and the overall look and feel of the *Breakout* game as an emphasis of its ad campaign constitutes a false designation of origin that is likely to cause confusion, or to deceive as to the sponsorship or approval of the KIT KAT ad campaign by Atari.

86.     Nestlé's conduct, as alleged above, constitutes false designation of origin in violation of the Federal Lanham Act, 15 U.S.C. § 1125(a).

87.     Atari is entitled to recover damages and/or Nestlé's profits in an amount to be determined at trial.

88.     Nestlé's wrongful activities have caused Atari irreparable injury.

Plaintiff has sustained and will sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### (Dilution by Blurring Under 15 U.S.C. § 1125(c))

### (Against All Defendants)

89.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 88 of this Complaint as if fully set forth here.

90.     The BREAKOUT mark is widely recognized by the general consuming public of the United States and is owned by Atari.

91.     Nestlé's commercial advertisement depicted a game simulation that is very similar to and virtually indistinguishable from the distinctive *Breakout* graphics covered by Atari's valid registered copyrights.

92.     Nestlé has used and continues to use Atari's famous *Breakout* imagery and the term "Breakout."  Through these activities, Nestlé intended to create an association with Atari's famous BREAKOUT mark. There is, however, no actual association between Nestlé's "Breakout" ad campaign and the Atari Breakout game or the BREAKOUT mark.

93.     Atari is entitled to recover damages and/or Nestlé's profits in an amount to be determined at trial.

94.     Atari is entitled to an order from this Court preliminarily and permanently enjoining Nestlé from using the BREAKOUT mark in furthering its KIT KAT ad campaign.

95.     Because Nestlé has willfully intended to cause dilution of the BREAKOUT mark, Atari is further entitled to recover its costs of suit and reasonable attorney's fees, pursuant to 15 U.S.C. § 1117 and 1125(c)(2).

## FIFTH CAUSE OF ACTION

### (Unfair Competition Under Cal. Bus. & Prof. Code § 17200)

### (Against All Defendants)

96.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 95 of this Complaint as if fully set forth here.

97.     Nestlé has, without permission, license, or consent, used Atari's BREAKOUT mark and Breakout gameplay imagery in its KIT KAT ad campaign. Such action is likely to cause confusion amongst consumers in California as to Atari's sponsorship, approval, or endorsement of Nestlé's KIT KAT ad campaign.

98.     Such blatant misappropriation of Atari's IP is unlawful and/or unfair under the California Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200.

99.     Nestlé's wrongful activities have caused Atari irreparable harm. Unless the abovementioned conduct is enjoined by this Court, Nestlé is free to continue expanding its unlawful activities and to cause further injury to Atari. This injury includes a reduction to the distinctiveness of Atari's BREAKOUT mark and reputation that cannot be remedied through damages.

100.    Atari has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### (Common Law Unfair Competition)

### (Against All Defendants)

101.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 100 of this Complaint as if fully set forth here.

102.    The BREAKOUT trademark and trade dress is valid, legally protectable and has acquired significant secondary meaning over the last 42 years.

103.    Atari's use of the BREAKOUT mark and trade dress predates any use by Nestlé.

104.    Nestlé's unauthorized use of the BREAKOUT trademark and trade

1  dress in advertisements for its KIT KAT products is likely to cause confusion,

2  mistake, or deception as to the source or origin of the products and/or is likely to

3  lead the consuming public to believe that Atari has licensed, authorized, approved,

4  or somehow sponsored Nestlé's products.

5      105.   Atari has been, and will continue to be, damaged and irreparably

6  harmed by the actions of Nestlé unless Nestlé is enjoined by this Court.

7      106.   Atari has no adequate remedy at law.

8      107.   Atari is entitled to recover damages and/or Nestlé's profits in an

9  amount to be determined at trial.

10     108.   Atari is informed and believes, and thereon alleges, that Defendants

11 committed the foregoing acts with the intention of depriving Plaintiff of its legal

12 rights, with oppression, fraud, and/or malice, and in conscious disregard of

13 Plaintiff's rights.  Plaintiff is, therefore, entitled to an award of exemplary and

14 punitive damages, according to proof.

15                        **PRAYER FOR RELIEF**

16     WHEREFORE, Plaintiff prays for the relief and judgment, as follows:

17     1.    That Plaintiff be granted permanent injunctive relief;

18     2.    That Defendants and all of their respective officers, agents, servants,

19 representatives, employees, attorneys, parent and subsidiary corporations, assigns

20 and successors in interest, and all other persons acting in concert with them be

21 permanently enjoined from using the BREAKOUT trademark and *Breakout* trade

22 dress and/or copyrights, or any mark or design confusingly similar thereto, in

23 connection with the marketing, promotion, advertising, sale, or distribution of any of

24 Nestlé's products;

25     3.    That Defendants file, within ten (10) days from entry of an injunction, a

26 declaration with this Court signed under penalty of perjury certifying the manner in

27 which Defendants have complied with the terms on the injunction;

28     4.    That Defendants be adjudged to have violated 15 U.S.C. § 1114 by

infringing Plaintiff's BREAKOUT trademark;

     5.    That Atari recover actual damages, Defendants' profits, and/or statutory damages in an amount to be proven at trial;

     6.    That Atari be awarded three times Nestlé's profits attributable to the infringement and three times all of Atari's damages, including lost licensing profits, loss of goodwill, and lost opportunities suffered as a result of Defendants willful, intentional, and deliberate acts in violation of the Lanham Act, as well as Plaintiff's costs, attorneys' fees, and expenses in this suit under the Lanham Act and Copyright Act;

     7.    That Atari recover punitive damages;

     8.    That Atari be granted pre-judgment and post-judgment interest;

     9.    That Atari be granted costs associated with the prosecution of this action; and

     10.    That Atari be granted such further relief as the Court may deem just and equitable.

DATED:  August 17, 2017        BROWNE GEORGE ROSS LLP
                                      Keith J. Wesley
                                      K.C. Maxwell

                        By:      *s/ Keith J. Wesley*
                                    Keith J. Wesley
               Attorneys for Plaintiff Atari Interactive, Inc.

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Rule 38(b)(1) of the Federal Rules of Civil Procedure, Plaintiff

3    hereby demands trial by jury in this action of all issues so triable.

4

5    DATED:  August 17, 2017                    BROWNE GEORGE ROSS LLP
                                                            Keith J. Wesley
6                                                           K.C. Maxwell

7

8                                                By:     *s/ Keith J. Wesley*
                                                 _____
9                                                         Keith J. Wesley
                                                 Attorneys for Plaintiff Atari Interactive, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**EXHIBIT A**

**CERTIFICATES OF U.S. TRADEMARK REGISTRATIONS FOR BREAKOUT, SUPER BREAKOUT AND BREAKOUT BOOST**

**(THREE (3) DOCUMENTS ATTACHED)**

# United States of America
### United States Patent and Trademark Office

# BREAKOUT BOOST

**Reg. No. 4,168,075**
**Registered July 3, 2012**

**Int. Cl.: 9**

**TRADEMARK**

**PRINCIPAL REGISTER**

ATARI INTERACTIVE, INC. (DELAWARE CORPORATION)
417 FIFTH AVENUE
NEW YORK, NY 10016

FOR: DOWNLOADABLE ELECTRONIC GAMES VIA THE INTERNET AND WIRELESS DEVICES; ELECTRONIC, VIDEO AND MULTIMEDIA GAME SOFTWARE FOR USE ON PERSONAL COMPUTERS AND ELECTRONIC GAME PLAYING MACHINES; DOWNLOADABLE RECORDED COMPUTER GAME SOFTWARE PROGRAMS; GAME SOFTWARE FOR COMPUTERS, DOWNLOADABLE VIDEO GAME SOFTWARE, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 12-15-2011; IN COMMERCE 12-15-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 1,241,326, 2,553,961, AND 3,364,305.

SER. NO. 85-498,845, FILED 12-19-2011.

DEIRDRE ROBERTSON, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.

> ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date). The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

**United States Patent and Trademark Office**

Reg. No. 2,553,961
Registered Mar. 26, 2002

## TRADEMARK
### PRINCIPAL REGISTER

## BREAKOUT

ATARI INTERACTIVE, INC. (DELAWARE COR-
PORATION)
1027 NEWPORT AVENUE
PAWTUCKET, RI 02862

FOR: COMPUTER GAME PROGRAMS AND VI-
DEO GAME CARTRIDGES, IN CLASS 9 (U.S. CLS.
21, 23, 26, 36 AND 38).

FIRST USE 9-23-2000; IN COMMERCE 9-23-2000.

OWNER OF U.S. REG. NO. 1,241,326.

SN 76-062,330, FILED 6-2-2000.

RUSS HERMAN, EXAMINING ATTORNEY

Int. Cl.: 28

Prior U.S. Cl.: 22

**United States Patent and Trademark Office**

Reg. No. 1,241,326
Registered Jun. 7, 1983

## TRADEMARK
### Principal Register

## SUPER BREAKOUT

Atari, Inc. (Delaware corporation)
1265 Borregas Ave.
Sunnyvale, Calif. 94086

For:  NON-COIN-OPERATED  ELECTRONIC
AMUSEMENT GAME EQUIPMENT, in CLASS
28 (U.S. Cl. 22).
First use Dec. 7, 1979; in commerce Dec. 14, 1979.
Owner of U.S. Reg. Nos. 1,134,005 and 1,202,554.

Ser. No. 363,481, filed May 7, 1982.

W. A. CONN, Examining Attorney

# EXHIBIT B

**EXHIBIT B**

**SCREEN CAPTURES OF KITKAT ONLINE ADVERTISEMENT AND ORIGNAL BREAKOUT GAME PLAY**



**EXHIBIT B**
**SCREEN CAPTURES OF KITKAT ONLINE ADVERTISEMENT AND ORIGINAL BREAKOUT GAMEPLAY –**
**(CON'T)**



**EXHIBIT B**
**SCREEN CAPTURES OF KITKAT ONLINE ADVERTISEMENT AND ORIGINAL BREAKOUT GAMEPLAY –
(CON'T)**



# EXHIBIT C

**EXHIBIT C**
**SCREEN CAPTURE OF KITKAT ONLINE FACEBOOK ADVERTISEMENT**



# EXHIBIT D

**EXHIBIT D**

**SCREEN CAPTURE OF KITKAT ONLINE TWITTER ADVERTISEMENT**

https://twitter.com/search?q=es%20hora%20de%20romper%20el%20breakout&src=typd

